UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


JASON ANDERSON, RICHARD BEAUDOIN,
TIMOTHY BELL, CHAD COUSINO, WILLIAM
CURRIE, DANIEL DORAN, JEREMY JOHNS,
BOBBY LAVENDER, JOHN MESKY, STANLEY
POCHRAN, GEORGE QUIROZ, ALEX ROMAN,
JOSE STACHULSKI, JOE SERVETTER, SHANNON
THRELKELD, JAMES M. URSITTI, GREGORY
WARD, and ALBERT YOUNG,

        Plaintiffs,                  CASE NO. 04-74345

-vs-                                  PAUL D. BORMAN
                                  UNITED STATES DISTRICT JUDGE

CITY OF TAYLOR, KENNETH A. COSTELLA,
GREGORY PITONIAK, and VINCE FEDEL, jointly
and severally as well as individually and in their official
capacities.

        Defendants.
_____/

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS AND/OR SUMMARY JUDGMENT

## BACKGROUND:

The case stems from a wellness program the Taylor Fire Department enacted for its

employees, which required a mandatory blood draw.  The Federal Emergency Management

Agency ("FEMA") created the "Assistance to Firefighters' Grant Program" to provide funding

directly to fire departments for the purpose of protecting the health and safety of the public and

firefighting personnel against fire and fire-related hazards.

Grant funding was designated for six categories: training, fitness program, vehicles,

firefighting equipment, personnel protective equipment, and fire prevention programs.  The local

1

funding matching requirement for a fire department, like Taylor's, whose population served is greater than 50,000, is 30%.  (Defendants' Motion, Ex. 1).

In the late 1990s, the Taylor Fire Service Joint Labor Management Wellness-Fitness Initiative was created.  (*Id.* Ex. 2).   The goal of that initiative was to improve the quality of life of all uniformed personnel.  The project sought to maintain fit, healthy and capable firefighters and EMS responders throughout their career.

The FEMA grant application package sets forth the required information for the preparation of the grant proposal.  Regarding the wellness and fitness programs, the package states:

> FEMA may make grants for the purpose of establishing and/or equipping wellness and fitness programs for firefighting personnel, including the procurement of medical services to ensure that the firefighting personnel are physically able to carry out their duties (purchase of medical equipment is not eligible under this category).
>
> We believe that in order to have an effective wellness/fitness program, fire departments must offer both an entry physical examination and an immunization program. Accordingly, applicants for grants in this category must currently offer both benefits, or must propose to initiate both a physical examination and immunization program with these grant funds in order to receive additional funding for either of these purposes.  We believe the greatest benefit will be realized by supporting new wellness and fitness programs, and therefore, we will accord higher competitive ratings to those applicants lacking wellness/fitness programs over those applicants that already posses a wellness/fitness program.  Finally, since participation is critical to receiving any benefits from a wellness or fitness program, we will give higher competitive rating to departments whose wellness and fitness programs mandate participation as well as programs that provide incentives for participation.

(*Id.* Ex. 3).  (emphasis added).

The Taylor Fire Department's proposed narrative provided that participation in the program was mandatory along with a fitness incentive for participation in the program.  (*Id.* Ex. 4).  The fitness incentives included a free membership for each employee for the city's recreational facility which contained both cardiovascular and strength training equipment.  (*Id.*).

2

The proposed incentives also included free rounds of golf at the city-owned golf courses and blocks of ice time at the city's arena.  (*Id.*).

Defendants Fire Chief Kenneth Costella and Deputy Fire Chief Vincent Fedel were notified that the Taylor Fire Department's grant was accepted on August 1, 2001.  The federal share of the grant was $105,400.00 and the city of Taylor's share of the cost was $45,171.00.  (*Id.* Ex. 6).

The wellness program instituted by the Taylor Fire Department included health appraisals by the Oakwood Hospital staff.  This appraisal included a mandatory blood draw, which forms the basis for this lawsuit.  The blood draws were used to obtain a "Lipid Profile test" to find out the Plaintiffs' cholesterol, triglycerides, HDL cholesterol, VLDL cholesterol, and LDL cholesterol.  (Plaintiffs' Response, Ex. 6).

Plaintiffs Jason Anderson, Richard Beaudoin, Timothy Bell, Chad Cousino, William Currie, Daniel Doran, Jeremy Johns, Bobby Lavender, John Mesky, Stanley Pochran, George Quiroz, Alex Roman, Jose Stachulski, Joe Servetter, Shannon Threlkeld, James M. Ursitti, Gregory Ward, and Albert Young (collectively "Plaintiffs") were required to submit to these blood draws.  Plaintiffs contend that these blood draws violated their constitutional rights.

On July 22, 2002, the IAF Local 1252 Union filed a grievance on behalf of Plaintiffs stating that the blood draw violated their collective bargaining agreement.  Defendant Chief Kenneth Costella denied the grievance on July 23, 2002.  The Court notes that as a result of the Plaintiffs' union grievance, the Taylor Fire Department sought permission from FEMA to abandon any further follow-up regarding the blood draws, which FEMA granted.

Plaintiffs bring suit against Chief Kenneth Costella, Gregory Pitoniak, the Mayor of Taylor and Deputy Chief Vince Fedel and the City of Taylor ("Defendants").   Plaintiffs set forth

3

two counts against Defendants - Count I - Deprivation of the Plaintiffs' Civil Rights as to all

Defendants, and Count II - Deprivation of Plaintiffs' State Constitutional Rights.

Defendants filed a motion to dismiss and/or summary judgment[1] on April 12, 2005.

Plaintiffs responded on May 13, 2005.  Defendants filed their reply on May 31, 2005.  Oral

argument was held on August 3, 2005.

## ARGUMENTS:

### 1.    Defendants' Arguments

Defendants contend that no constitutional violation occurred and Defendants are entitled

to dismissal pursuant to *National Treasury Employees Union v. Van Raab,* 489 U.S. 656 (1989).

(Defendants' Motion, at 8).  Defendants further contend that qualified immunity warrants

dismissal.  (*Id.* at 10).  Defendant also argue that Plaintiffs Fifth Amendment claim is not

applicable to the instant facts.  (*Id.* at 12).  Lastly, Defendants state that the alleged harm to

Plaintiffs was de minimis and does not support a constitutional violation.  (*Id.* at 13).

### 2.    Plaintiffs' Arguments

Plaintiffs argue that the blood draws are unreasonable searches under the Fourth

Amendment.  (Plaintiffs' Response at 3).  Plaintiffs contend that Defendants have failed to

articulate a "special need" for the blood draws as required by Supreme Court precedent.  (*Id.*).

Plaintiffs further argue that Defendants' de minimis argument is not applicable to the instant

facts.  (*Id.* at 15).  Lastly, Plaintiffs contend that their claim properly includes a reference to the

---

[1]Federal Rule of Civil Procedure 12 (c) provides that "[i]f on a motion for judgment on the pleadings, matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56...." (Fed. R. Civ. P. 12(c)).  Accordingly, the Court treats Defendant's motion as a motion for summary judgment under Fed. R. Civ. P. 56 because both parties present evidence outside the pleadings.

Fifth Amendment.  (*Id.*).

## ANALYSIS:

**1.      Standard**

Pursuant to Federal Rule of Civil Procedure 56, a party against whom a claim,

counterclaim, or cross-claim is asserted may "at any time, move with or without supporting

affidavits, for a summary judgment in the party's favor as to all or any part thereof."  Fed. R. Civ.

P. 56(b).  Summary judgment is appropriate where the moving party demonstrates that there is no

genuine issue of material fact as to the existence of an essential element of the nonmoving party's

case on which the nonmoving party would bear the burden of proof at trial.  *Celotex Corp. v.

Catrett*, 477 U.S. 317, 322 (1986).

> Of course, [the moving party] always bears the initial responsibility
> of informing the district court of the basis for its motion, and
> identifying those portions of "the pleadings, depositions, answers
> to interrogatories, and admissions on file, together with the
> affidavits, if any," which it believes demonstrate the absence of a
> genuine issue of material fact.

*Id*. at 323; *Gutierrez v. Lynch*, 826 F.2d 1534, 1536 (6th Cir. 1987).

A fact is "material" for purposes of a motion for summary judgment where proof of that

fact "would have [the] effect of establishing or refuting one of the essential elements of a cause of

action or defense asserted by the parties."  *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir.

1984) (quoting Black's Law Dictionary 881 (6th ed. 1979)) (citations omitted).  A dispute over a

material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for

the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

Conversely, where a reasonable jury could not find for the nonmoving party, there is no genuine

issue of material fact for trial.  *Id.*; *Feliciano v. City of Cleveland*, 988 F.2d 649, 654 (6th Cir.

1993).  In making this evaluation, the court must examine the evidence and draw all reasonable inferences in favor of the non-moving party.  *Bender v. Southland Corp.*, 749 F.2d 1205, 1210-1211 (6th Cir. 1984).

If this burden is met by the moving party, the non-moving party's failure to make a showing that is "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial" will mandate the entry of summary judgment.  *Celotex*, 477 U.S. at 322-23.  The non-moving party may not rest upon the mere allegations or denials of his pleadings, but the response, by affidavits or as otherwise provided in Rule 56, must set forth specific facts which demonstrate that there is a genuine issue for trial. Fed. R. Civ. P. 56(e).  The rule requires that non-moving party to introduce "evidence of evidentiary quality" demonstrating the existence of a material fact.  *Bailey v. Floyd County Bd. of Educ.*, 106 F.3d 135, 145 (6th Cir. 1997); *see also Anderson*, 477 U.S. at 252 (holding that the non-moving party must produce more than a scintilla of evidence to survive summary judgment).

**2.     Discussion**

**a.     Plaintiffs' Fourth Amendment Claim**

The Court finds that the mandatory blood draw implicated Plaintiffs' rights under the Fourth Amendment.  The Fourth Amendment to the United States Constitution protects "[t]he rights of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."

The Court finds that a collection of blood samples constitutes a search under the Fourth Amendment.  The Supreme Court in *Skinner v. Railway Labor Executives Ass'n,* 489 U.S. 602 (1989) provided that the act of drawing blood itself, even if the blood is not later tested for the presence of illegal drugs, is a search under the Fourth Amendment.  The *Skinner* Court provided:

6

> In light of our society's concern for the security of one's person, it is obvious that this physical intrusion, penetrating beneath the skin, infringes an expectation of privacy that society is prepared to recognize an reasonable. The ensuing chemical analysis of the sample to obtain physiological data is a further intrusion of the tested employee's privacy interests.

*Id.* at 616.

Generally, a search or seizure under the Fourth Amendment must be based upon reasonable suspicion of wrongdoing in order to be reasonable, and thus constitutional. The Supreme Court, in evaluating the constitutionality of a search and seizure, generally conducts a balancing test to determine if the intrusion is reasonable. *See, e.g. Vernonia School Dist. 47J v. Acton,* 515 U.S. 646, 652-53 (1995).

Defendants contend that no constitutional violation occurred and Defendants are entitled to dismissal pursuant to *National Treasury Employees Union v. Van Raab,* 489 U.S. 656 (1989). Defendants argue that under *Von Raab,* the blood draws were reasonable constitutional searches. In *Von Raab,* the Court addressed whether a drug testing program for Customs Service employees was constitutional. The Court noted that the program was not designed to serve the ordinary needs of law enforcement, and used a special needs analysis.[2] The Court found that the government has a compelling interest in ensuring that front line interdiction personnel are physically fit, and have unimpeachable integrity and judgment. Regarding the employees' privacy interests, the Court found that the diminished privacy expectations of those front-line customs were outweighed by the compelling government interest.

The Court finds that the instant blood draws are not constitutional under *Von Raab*; its

---

[2]In *Chandler v. Miller, infra,* the Supreme Court substantially refined the special needs test.

7

holding has been limited by the Supreme Court decision in *Chandler v. Miller,* 520 U.S. 305, 313 (1997).  The *Chandler* Court provided:

> [h]ardly a decision opening broad vistas for suspicionless searches, *Van Raab* must be read in its unique context.  As the Customs Service reported in announcing the testing program: 'Customs employees, more than any other Federal workers, are routinely exposed to the vast network of organized crime that is inextricably tied to illegal drug use.'

*Id.* quoting *Van Raab* at 660. Thus, based upon the fact that the Customs Service employees' job functions required that they were routinely exposed to illegal drugs, the Court found that a special need for the drug testing existed.

In *Chandler v. Miller, supra*, the Supreme Court delineated that before a court balances the public interests at issue regarding a urine drug test, a court must specifically determine whether the program at issue qualifies as a special need.

Stated another way, in certain instances, a search or seizure unsupported by probable cause may be constitutional when special needs, beyond the normal need for law enforcement, make the warrant and probable cause requirements impracticable.  *Board of Education of Independent School District No. 92 Pottawatamie County v. Earls,* 536 U.S. 822, 829 (2002).

The 10th Circuit aptly analyzed *Chandler* and the "special needs" inquiry as follows:

> Only if we can say that the government has made that special need showing do we then inquire into the relative strengths of the competing private and public interests to settle whether the testing requirement is reasonable under the Fourth Amendment.  If the government has not made its special need showing, then the inquiry is complete, and the testing program must be struck down as unconstitutional.  Thus, the first, and ultimately decisive, question for this appeal is whether the City of Albuquerque's drug testing program is warranted by a special need.

*19 Solid Waste Dept. Mechanics v. City of Albuquerque,* 156 F.3d 1068, 1072 (10th Cir. 1998). The Sixth Circuit has interpreted *Chandler* identically.  *See International Union et al. v. Winters,*

*et al.,* 385 F.3d 1003 (6th Cir. 2004). Thus, this Court will, as a threshold matter, determine whether Defendants have made a showing of a special need for the blood draws.

Defendants contend that all of Plaintiffs' cited cases involve some sort of punitive aspect to a seizure, i.e. in *Chandler,* a testing of urine was a prerequisite to qualify for state office. In other words, Defendants contend that there is no punitive aspect in the blood draw because it is used solely for the benefit of a health screening of Plaintiffs. It is correct that the results of the Plaintiffs' blood draws will not dictate a particular punishment upon the Plaintiffs. However, the Defendants miss the central aspect of the blood draws - - they are *mandatory.* The United States Supreme Court has set forth that a blood draw *itself* is a search or seizure implicating the Fourth Amendment. *Skinner* at 616. Because the blood draws are mandatory, it follows that Plaintiffs would be subject to some form of punishment for refusing the constitutionally protected intrusion. In fact, Plaintiffs Pochron, Bell, and Lavender set forth in their affidavits that they would have been punished had they not participated in the blood draw. (Plaintiffs' Response, Exs. 3-6). Herein, lies the punitive aspect to the blood draws at issue in this case. The Court notes that the United States Supreme Court has not held there must be a punitive aspect tied to the results of a blood draw.

The Court finds that the mandatory blood draws instituted by Defendants, despite the fact that they were intended to benefit Plaintiffs, violates their personal privacy rights protected by the Fourth Amendment. As Justice Brandeis set forth in his landmark dissent in *Olmstead v. United States,* 277 U.S. 438 (1928), albeit addressing a more serious issue, "[e]xperience should teach us to be most on our guard to protect liberty when the Government's purposes are beneficent." *Id.* at 485.

Defendants do not appear to dispute that the *Chandler* special needs test applies instantly.

9

Defendants state that the materials in the FEMA grant process set forth the special need for the

blood draws:

> fire fighters and EMS responders respond to emergency incidents that require extreme
> physical output and often result in adverse physiological and psychological outcomes.
> These adverse outcomes, over time, can and do affect the overall wellness of the fire
> fighting and emergency response system.  Often, past attempts to address fitness have
> been piecemeal, such as the recent trends to unilaterally implement timed, task-based
> performance tests.  Such piecemeal approaches have failed to produce universally
> acceptable and productive results.

Defendant's Reply at 2.

The Court finds *Chandler* instructive.  In *Chandler,* the state of Georgia passed a law that

required potential candidates for state office to pass a urine drug test.  The Supreme Court struck

the law down as unconstitutional.  The Court stated that before it balances the public interests at

issue regarding Georgia's law, it must specifically determine whether the program at issue

qualifies as a special need.  The Court provided:

> Our precedents establish that the proffered special need for drug testing must be
> substantially important enough to override the individual's acknowledged privacy
> interest, sufficiently vital to suppress the Fourth Amendment's normal requirement of
> individualized suspicion.

*Id.* at 318.

The State of Georgia argued that a special need existed on the grounds that unlawful drug

use was incompatible with holding state office because the use of illegal drugs calls into question

the official's judgment and integrity; jeopardizes the discharge of public functions; and

undermines public confidence.  The Court found that State of Georgia's argument notably lacked

"any indication of a concrete danger demanding departure from the Fourth Amendment's main

rule."  *Id.* at 319.  The Court found that a demonstrated problem of drug abuse, while not in all

cases necessary to the validity of a testing regime, would shore up an assertion of special need for

10

a suspicionless general search program.  The *Chandler* Court distinguished its facts from cases where the risk to public safety is substantial and real, such as searches at airports and entrances to courts and other official buildings.  The Court went on to state "[b]ut, where, as in this case, public safety is not genuinely in jeopardy, the Fourth Amendment precludes the suspicionless search, no matter how conveniently arranged."  *Id.* at 323.

Notably, the *Chandler* Court specifically provided "Georgia's singular drug test for candidates is not part of a medical examination designed to provide certification of a candidates general health, and we express no opinion on such examinations."  *Id.*

The Court finds that the mandatory blood draws at issue are unconstitutional based upon the principles delineated from *Chandler*.  Notably, Justice Rehnquist provided in his dissent:

> Lest readers expect the holding of this case to be extended to any other case, the Court [majority] notes that the drug test here is not a part of medical examination designed to provide certification of a candidate's general health.  It is all but inconceivable that a case involving that sort of requirement could be decided differently than the present case; the same sort of urinalysis would be involved.  The only possible basis for distinction is to say that the State has a far greater interest in the candidate's 'general health' than it does with respect to his propensity to use illegal drugs.  But this is the sort of policy judgment that surely must be left to legislature, rather than being announced on high by the Federal Judiciary.

*Id.* at 327-28.

The Court finds that Defendants have failed to establish that there is a special need for the blood draws.  The Court finds that there has been no showing by Defendants that there has been a problem with physically unfit fire and emergency response workers.  The Sixth Circuit has set forth, in the context of drug testing, the importance of determining whether the targeted group exhibits pronounced drug problems.  *Knox County Education Ass'n. v. Knox County Bd. Ed.,* 158 F.3d 361, 373 (6th Cir. 1998).  Analogizing the mandatory blood test to drug testing procedures, the Court finds that there is no evidence that Plaintiffs experience pronounced fitness problems.

11

Nor is there is high degree of harm to the public from high cholesterol readings from Plaintiffs.

Defendants have not shown "any indication of a concrete danger [to public safety] demanding departure from the Fourth Amendment's main rule." *Chandler* at 319. The instant blood draws were used to determine employees' cholesterol levels. A cholesterol reading, while an important health barometer, cannot accurately determine the overall physical fitness of an employee as it relates to how that employee is able to respond in an emergency situation. Further, any risk from high cholesterol is likely to take years to manifest. The Court finds that this is not a situation involving a high risk of harm to the public such as an intoxicated employee with a firearm or a drug impaired train conductor. Thus, the Court finds that Defendants have failed to articulate a special need for the blood draws. As the Sixth Circuit has provided:

> a program may be unconstitutional even if the intrusion upon the individual's privacy rights were minimal, if the government fails to establish a special need justifying the intrusion without individualized suspicion.

*International Union, infra,* at 1007.

The Court, based upon the Supreme Court's holding in *Chandler,* finds that Defendants have failed to show a special need for the blood draw.

The Court acknowledges that there is no exact precedent on point. The parties properly analogize the instant blood draws to the long line of Supreme Court precedent relating to drug testing. One possible point of distinction between the drug testing cases and the instant case is that there is no punitive aspect tied to the results of the blood draws. However, the applicable Supreme Court precedent is not based upon the punitive aspect tied to the results of the drug test, but rather the search itself. Further, as noted above, there is a punitive aspect to the blood draws in that the parties are forced to partake in them or be subject to discipline. The Court also notes

12

that *Chandler* has created confusion to the Fourth Amendment doctrine. As one commentator

has provided: "[t]he effects of *Chandler* remain to be seen, but the decision is bound to cause

further confusion of Fourth Amendment doctrine. The Court claimed to follow the *Skinner -Von

Raab-Acton* framework, when actually, the Court created a new "special needs" analysis by

adopting a new minimum threshold of substantial need." Joy L. Ames, CHANDLER V. MILLER:

REDEFINING "SPECIAL NEEDS" FOR SUSPICIONLESS DRUG TESTING UNDER THE FOURTH

AMENDMENT, 31 Akron L. Rev. 273 (1997). However, for the reasons stated above, the Court

finds that the mandatory blood draws violate the Fourth Amendment.

Even if the Court were to find that a special need existed in this case, the Court still finds

that the State's interest in maintaining physically fit emergency workers is not advanced by the

cholesterol screening, as discussed above. The Court finds that the Plaintiffs' interest to be free

from the mandatory search outweighs the public's need for emergency workers with low

cholesterol. The Court notes that the special needs test is inextricably tied to this balancing test

in that the state's special needs are what is balanced against the individual's privacy interests.

*See International Union,* at 1013. Finally, the Court finds it significant that the test results are

not provided to the government, but instead, only to the Plaintiffs. This is a significant sign that

the government does not need this test for its purposes.

> **b.     Are Defendants Entitled to Qualified Immunity?**

Under the doctrine of qualified immunity, government officials who perform

discretionary functions will not incur liability for civil damages "insofar as their conduct does not

violate clearly established statutory or constitutional rights of which a reasonable person would

have known." *Hinchman v. Moore,* 312 F.3d 198, 205 (6th Cir. 2003). In determining whether

an official is entitled to qualified immunity, the Court looks to whether the law was clearly

established at the time of the alleged action. *Stemler v. City of Florence,* 126 F.3d 856, 866 (6th Cir. 1997).

Initially, the Court finds that qualified immunity does not apply to Defendant City of Taylor.[3]  Qualified immunity protects government officials, sued in their *personal* capacities for performing discretionary functions from liability.  *Stanley v. City of Norton et. al.* 124 Fed. App. 305 (6th Cir. January 6, 2005) (unpublished) (quoting *Jackson v. Leighton,* 168 F.3d 903, 909 (6th Cir. 1999) (italics added).

Plaintiffs argue that their rights have been clearly established since 1997 when the *Chandler, infra,* case was decided.  Therefore, Plaintiffs contend that the individual Defendants are not entitled to qualified immunity.  The Court disagrees with Plaintiffs and finds that qualified immunity applies as to the individual Defendants.

The Court finds *Reynolds v. City of Anchorage,* 379 F.3d 358 (6th Cir. 2004) instructive as to this issue.  In *Reynolds,* the Court addressed a police officer's warrantless strip search of a female officer who resided in a private juvenile home constitutional under the Fourth Amendment, as that facility had a strong interest in eliminating drug use on the premises. Notably, the Sixth Circuit provided that even if it were to find the search unconstitutional, the doctrine of qualified immunity would still shield the individual defendants from liability.  The Court found that it was not clearly established that the searches were unlawful.  The Sixth Circuit

---

[3]The Court notes that Plaintiffs bring their claims under 42 U.S.C. §1983.  The Sixth Circuit has held that "in order to state a claim against a city or a county under §1983, a plaintiff must show that his injury was caused by an unconstitutional 'policy' or 'custom' of the municipality.  *Stemler v. City of Florence,* 126 F.3d 856, 865 (6th Cir. 1997); see *Monell v. Department of Soc. Servs. of the City of New York,* 436 U.S. 658, 692 (1978).  Although Plaintiffs did not address this issue in their complaint (neither party addressed this issue in their pleadings), it appears that the mandatory drug testing qualifies as a policy under *Monell.*

provided:

> There has been no decision of the Supreme Court, this court or any courts within this circuit - - or, as far we know, of any other court - - that has addressed the application of the Fourth Amendment to strip searches of juvenile delinquents in an institutional home in which they are confined. Moreover, as is shown by the analysis, in Part II above, of existing precedent that deals with the Fourth Amendment status of strip searches in other contexts, the question is close and difficult. It involves subtle legal distinctions and inferences that a reasonable police officer would not and could not be expected to make.

*Id.* at 367.

Similarly here, the Court finds that there is no decision in the Supreme Court or the Sixth Circuit addressing the constitutionality of mandatory warrantless blood tests for health benefit purposes. As Plaintiffs noted, there is existing precedent relating to drug testing (i.e. *Chandler*), however, the Court finds that the extension of *Chandler* in this case is close and involves subtle legal distinction. The individual Defendants could not be expected to make these legal determinations based upon the subtle distinctions and inferences set forth in this memorandum. Therefore, the Court finds summary judgment appropriate as to the individual Defendants in this case.

### c.   Plaintiffs' Fifth Amendment claim

Defendants contend that Plaintiffs' claims in "this case do not rise to the level of those protected by the 5th Amendment through the 14th Amendment." (Defendant's Reply, at 4). Plaintiffs, on the other hand, argue that the Court should deny Defendants' motion in this respect until they can show that the 5th Amendment is not applicable based on the concept of ordered liberty. The Court notes that Plaintiffs fail to substantively argue that the blood draws violate the Fifth Amendment, rather Plaintiffs direct their arguments based upon the Fourth Amendment. The Court finds this consistent with the case law in that the analogous cases to the blood draws at issue are addressed under the Fourth Amendment.

15

The Court finds that this case is better addressed under the Fourth Amendment.  The Court notes that in *Schmerber v. California,* 384 U.S. 757 (1966) the petitioner argued that the mandatory drawing of blood by the police when he was suspected of drunk driving violated his rights under Fifth Amendment of Due Process and Self Incrimination.  The Court found that this matter was best addressed under the Fourth Amendment.  Justice Brennan, writing for the majority, wrote:

> The values protected by the Fourth Amendment thus substantially overlap those the Fifth Amendment helps to protect.  History and precedent have required that we today reject the claim that the Self-Incrimination Clause of the Fifth Amendment requires the human body in all circumstances to be held inviolate against state expeditions seeking evidence of crime.  But if compulsory administration of blood test does not implicate the Fifth Amendment, it plainly involves the broadly conceived reach of a search and seizure under the Fourth Amendment....Such testing procedures plainly constitute searches of persons, and depend antecedently upon seizures of persons, within the meaning of that Amendment.

*Id.* at 918.  Further, as the Ninth Circuit held, in addressing a California requirement that a state employee submit to an independent medical examination:

> Thus, in addition implicating the Fourth Amendment, forcing employees to submit to a medical examination would implicate their rights under the Due Process Clause because such an examination would inevitably reveal private medical information.  We do not believe, however, that it would make sense to divide medical examinations into two categories - - those that implicate the Fourth Amendment and those that implicate the Due Process Clause of the Fifth or Fourteenth Amendment - - or to examine such intrusions under two different approaches.  Because various types of medical tests [including blood draws] have already been classified as implicating the Fourth Amendment, we believe that all such tests and examinations should be analyzed under the rubric of that Amendment.

*Yin v. State of California,* 95 F.3d 864, 871 (9th Cir. 1996).  Similarly, here, the Court addresses the challenged blood draws under the rubric of the Fourth Amendment.  However, if Plaintiffs were to argue that their Fifth Amendment rights were violated, Plaintiffs could do so

16

via the Fourteenth Amendment claim based upon the invasion of their privacy rights through the

blood draws.

As Justice Stevens provided in his opinion concurring in part, dissenting in part, in

*Chavez v. Martinez,* 538 U.S. 760, 788 (2003):

> By its terms, the Fifth Amendment itself has no application to the States.  It is, however,
> one source of the protections against state actions that deprive individuals of rights
> 'implicit in the concept of ordered liberty' that the Fourteenth Amendment guarantees.

*Id.* at 788.   The Supreme Court has held that the Fourteenth Amendment's guarantee of personal

privacy "must be limited to those which are fundamental or implicit in the concept of ordered

liberty."  *Paul v. Davis,* 424 U.S. 693, 713 (1976).

Although not briefed by the parties, it appears Plaintiffs' Fifth Amendment claim via the

Fourteenth Amendment is based upon the invasion of their privacy rights through the blood

draws.  In *Whalen v. Roe,* 429 U.S. 589 (1977), although the Supreme Court found the New York

law in issue constitutional, it held that the constitutional right to privacy grounded in the

Fourteenth Amendment protects not only individual autonomy in intimate matters, but also an

individual's interest in avoiding divulgence of highly personal information.[4]  In *Whalen,* the

Court upheld a New York law which required physicians to compile prescription records

containing detailed patient information for a centralized state run database.

The Sixth Circuit reads *Whalen* and *Nixon* narrowly, and "balances an individual's

interest in nondisclosure of informational privacy against the public's interest in and need for the

_____

[4]See also *Nixon v. Administrator of General Services,* 433 U.S. 425 (1977) in which the
Court echoed these sentiments but still compelled President Nixon to disclose personal
communications to government archivists in light of the important government interest of
preserving the communications.

invasion of privacy where the individual privacy is of constitutional dimension." *Kallstron et al.*

*v. City of Columbus,* 136 F.3d 1055, 1061 (6th Cir. 1998).[5]  In the Sixth Circuit, courts use a two

step process when analyzing informational privacy claims:

> First, they ask whether the interest at stake implicates either a fundamental right or one
> implicit in the concept of ordered liberty.  If such a right was implicated, the
> government's interest in disseminating the information must be balanced against the
> individual's interest in keeping the information private.  This balancing test should only
> be employed if a fundamental or traditional right is violated.  'Not all rights of privacy or
> interests in nondisclosure of private information are of constitutional dimension, so as to
> require balancing government action against individual privacy.'

*Villa v. Village of Elmore et al.,* 2002 U.S. Dist. LEXIS 23253 (December 3, 2002) (unpublished)

quoting *J.P. v. DeSanti,* 653 F.2d 1080, 1090 (6th Cir. 1981).  To extent Plaintiffs argue that the

dissemination of the blood test results showing their cholesterol readings violated their privacy

interests in nondisclosure of private information, the Court finds that these privacy interests are

"not of constitutional dimension." Further, Defendants point out that the results of the blood draw

only went to the individual firefighters.

On the other hand, the liberty interests preserved by the Due Process Clause of the Fifth

Amendment, later incorporated into the Fourteenth Amendment, include "those privileges long

recognized at common law as essential to the orderly pursuit of happiness by free men."

*Kallstrom* at 1062 quoting *Meyer v. Nebraska,* 262 U.S. 390, 399 (1923).  There is a

constitutionally protected liberty interest under the Fourteenth Amendment in refusing unwanted

medical treatment.  *Cruzan v. Director, Missouri Dep't. Of Health,* 497 U.S. 261, 278 (1990).

"But determining that a person has a 'liberty interest' under the Due Process Clause does not end

---

[5]As noted in *Kallstrom*, other Circuits have interpreted *Whalen* and *Nixon* more broadly,
interpreting the them as creating a constitutional right to be balanced against the public's interest
in and need for the invasion of privacy.

the inquiry," rather the determination of a constitutional violation "must be determined by balancing his liberty interests against the relevant state interests."  *Id.*  Therefore, the Court could analogize a blood draw to medical treatment, and find that Plaintiffs have a constitutionally protected liberty interest under the Fourteenth Amendment, and therefore are subject to the governmental interest balancing test.  However, as noted above and discussed under this opinion's Fourth Amendment analysis, the Court finds that the blood draws analogous to those at issue in this case have been consistently classified under the Fourth Amendment.   Accordingly, the Court finds that the blood draws at issue are best addressed under the Fourth Amendment.

       **d.**    **Defendants' De Minimis Harm Argument**

The Court finds that Defendants' argument that Plaintiffs' level of harm do not rise to the level of constitutionally compensable claims, fails.  The Court finds that Defendants' legal authority is not applicable to the facts of this case.  Defendants cite four cases in support of their theory.

In the first case cited by Defendants,  *Ross v. Duggan,* 113 Fed. Appx. 33 (6th Cir. May 19, 2004) (unpublished), the Sixth Circuit addressed a nuisance abatement program which impounded vehicles and provided for subsequent initiations of civil forfeiture proceedings. Defendants appear to cite to the Court's language that provides:

> no compensable *property right* was taken, because 'if satisfactory state procedures are provided in a procedural due process case, then no constitutional deprivation has occurred despite the injury.

*Id.* at 41.  The Court finds that *Duggan* was decided in the context of a procedural due process case, and in *Duggan,* the State provided subsequent constitutional procedures to address the taking of the plaintiffs' automobiles.  The Court finds that the instant case is distinguishable because Plaintiffs' claims are pursuant to an extensive and distinct line of legal authority under

19

the Fourth Amendment.  Plaintiffs' claims are not based upon state procedure, rather upon an

unlawful search and seizure.

 Similarly, the Court finds that the *Styles  v. McGinnis,* 28 Fed. Appx. 362 (6th Cir.

December 26, 2001) (unpublished) Court's analysis under the Eighth Amendment does not apply

in the instant case.  The Sixth Circuit in *Styles* recanted the standard for determining the

sufficiency of an injury under the Eighth Amendment's prohibition of cruel and unusual

punishment.  The Court held that:

> The Eighth Amendment's prohibition of cruel and unusual punishment excludes from
> constitutional recognition *de minimis* uses of physical force, provided that the use of force
> is not of a sort repugnant to the conscience of mankind.

*Id.* at 364.  The Court finds that the *Styles* Court's analysis related only to the Eighth Amendment

and is not applicable to the instant facts.

 Similarly, *White v. Burlington Northern & Sante Fe R. Co.,* 364 F.3d 789 (6th Cir. 2004)

is a Title VII case which interprets what amounts to an adverse employment action.  The Court

finds that there is no comparable adverse employment action requirement under Plaintiffs'

Section 1983 claim under the Fourth Amendment.  Further, in *Poppy v. City of Willoughby Hills,*

96 Fed. Appx. 292 (6th Cir. April 8, 2004) (unpublished), the last of Defendants' cited cases, the

Court addressed the adverse employment action element in a First Amendment retaliation claim.

The Court found that "isolated incidents of childishness do not amount to cognizable adverse

employment actions."  *Id.* at 296.  Again, the Court finds that Plaintiffs' Section 1983 Fourth

Amendment claim does not contain an adverse employment action requirement.  Accordingly,

the Court finds that *Poppy* is not helpful to Defendants' argument.  Thus, for the reasons set forth

above, the Court rejects Defendants' argument that Plaintiffs' harm does not meet the level of

compensable harm because there is no applicable authority supporting that proposition.

**CONCLUSION:**

The Court grants Defendants' Motion as to the individual Defendants based upon qualified immunity.  The Court denies Defendants' Motion as to Defendant City of Taylor regarding Plaintiffs' Fourth Amendment claim only.

**SO ORDERED.**


s/Paul D. Borman
PAUL D. BORMAN
UNITED STATES DISTRICT JUDGE

Dated:  August 11, 2005

CERTIFICATE OF SERVICE

Copies of this Order were served on the attorneys of record by electronic means or U.S. Mail on August 11, 2005.


s/Jonie Parker
Case Manager